CHARLES CARREON (OSB: 93469)
Online Media Law, PLLC
423 Gateway Drive
Pacifica, California 94044
Tel:  650/735-5277

Attorney for Plaintiff American Buddha

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| AMERICAN BUDDHA, an Oregon Nonprofit Corporation, | Case No.: 1:06-cv-3054 |
| Plaintiff, | PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO CITY OF ASHLAND'S MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| THE CITY OF ASHLAND AND THE WASHINGTON POST COMPANY, | |
| Defendants. | |

STATEMENT OF FACTS

The City of Ashland ("the City") is a municipal subdivision of the State of Oregon.  The City has operated its Internet service under the name of Ashland Fiber Net since the summer of 1999.  (Exhibit 1.)   The City website states, "The Ashland Fiber Network (AFN) is Ashland's own local high speed internet and cable service."[1]   Joe Franell testified as the designated witness under FRCP 30(b)(6) on behalf of the City with regard to specified matters.  (Deposition Notice, Exhibit 2; J. Franell Depo., 5:13-18.) He

---

[1] http://www.ashland.or.us/Links.asp The Telecommunications Division/AFN website describes AFN as "the fiber optic infrastructure that interconnects other governmental, municipal, educational, and health care institutions and enables the division to provide an enhanced portfolio of products and services to the citizens of Ashland and the surrounding area http://www.ashland.or.us/SectionIndex.asp?SectionID=486. The cable television facilities of AFN were directly operated by the City until October 17, 2006, when the City handed over "the community's cable TV service" to Ashland Home Net. http://ashlandtv.dev.projecta.com/files/AFN2AHN.TransferRelease.pdf

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
CITY OF ASHLAND'S MOTION FOR SUMMARY JUDGMENT

is the Information Technology Director for the City of Ashland, and it is his duty to "direct the operations" of AFN.  (Joe Franell Depo., 5:23-6:1.)[2]

AFN is " a 100 percent municipally owned" system that has as its goal "to provide advanced telecommunications services to the citizens of Ashland," including "high speed Internet services, television or other video services," all of which the City concedes "involve speech."  (J. Franell Depo., 25:19 – 26:2.)

AFN's Internet service permits users to host websites through a modem that has a unique "MAC address" that serves as an "on-off switch" for Internet speech:

> Q:  Every modem has what is called an Internet protocol, correct?
> A:  MAC address.
> Q:  MAC address that is unique, correct?
> A:  Yes.
> Q:  That modem is placed in the home or office of any Internet user here in the City of Ashland in order to obtain services on the Internet?
> A:  Yes.
> Q:  That modem can be utilized to send and receive email, correct?
> A:  Yes.
> Q:  It can be utilized to view Internet web sites, correct?
> A:  Yes.
> Q:  And it can also be used as a conduit to host web sites?
> A:  Yes.
> Q:  When the modem is turned off, you can't send or receive e-mail, view web sites, or host web sites through that IP address?

(Exhibit 2, Transcript of Joe Franell Depo., 26:16 – 27:21.)

Since 2005, plaintiff has used an AFN MAC address to operate a network of approximately forty websites hosted on an Internet "server" computer, plus various email accounts and online business software applications ( "Plaintiff's Network").  (Charles Carreon Dec. ¶ 4.)   The largest website on Plaintiff's Network is the American Buddha Online Library ("ABOL"), hosted at www.american-buddha.com, a membership website with a member list of approximately fifty-thousand and growing.  ABOL provides access to a library of literary and artistic works exclusively to members to warrant, prior to gaining admission, that they will use all of the media materials found therein "for private

---

[2] The Notice of Deposition setting forth the matters on which he was examined, and Excerpts from the Transcript of the Deposition of Joe Franell are filed herewith as Exhibits 2 and 3, respectively.

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
CITY OF ASHLAND'S MOTION FOR SUMMARY JUDGMENT

study, scholarship or research."[3]  (Charles Carreon Dec. ¶¶ 5-6.)   ABOL also features

including satirical political photo-collages.  (Charles Carreon Dec. ¶ 7.)  ABOL has

implemented security measures to keep all of its digital content behind the "ABOL

Signup Page."  (Charles Carreon Dec. ¶ 8.)

    Plaintiff's Network also hosts the web-version of a Southern Oregon political

magazine, The Ashland Free Press, at www.ashlandfreepress.com.  (Charles Carreon

Dec. ¶ 9.)  The Ashland Free Press has covered various financial and employment

problems that have dogged AFN over the last several years.  The Ashland Free Press

reported critically on the process whereby AFN chose to employ Joe Franell as AFN

head, notwithstanding the City's employment of his brother Mike Franell as the City

Attorney.[4]

    Plaintiff's Network is managed by Pine Creek Hosting, LLC ("PCH").   After the

August 2nd shutoff, Plaintiff's Network registered PCH as its agent for receipt of notices

of Infringement under the DMCA ("Plaintiff's Designated Agent").[5]  When PCH receives

a DMCA notice, rather than simply turning off Plaintiff's Network, it will remove only

the particular webpages designated by the complainant, thus utilizing the "least intrusive

means" of providing the regulation of free speech necessary to protect the interests of

copyright holders.  (Carreon Dec. ¶ 12.)

    Speaking as the City's designated witness, Joe Franell testified that AFN would

only turn off a modem hosting websites if: (1) it had been used to launch "viruses, spams,

network attacks," or (2) there was "a verified allegation of copyright infringement."

(Exhibit 2, Transcript of Joe Franell Depo., 29:5 – 30:1)  "A determination by AFN that

---

[3] ABOL provides access to copyrighted materials under the fair use exemption from copyright liability
accorded to libraries and archives pursuant to 17 USC § 108.

[4] The article, entitled "Not Looking Good – AFN Takes Mismanagement to a New Level," appears on the Internet at
http://www.ashlandfreepress.com/The_Ides_of_March_Edition/Not_Looking_Good--
AFN_Takes_Mismanagement_to_a_New_Level

[5] Plaintiff seeks Declaratory Relief to judicially confirm that the City should be ordered to take no action to
shut down Plaintiff's Network at any time.  A copyright infringement complainant is required to serve
DMCA notices on PCH, Plaintiff's Designated Agent.  http://www.copyright.gov/onlinesp/list/index.html

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
CITY OF ASHLAND'S MOTION FOR SUMMARY JUDGMENT

some content were pornographic, or obscene or doctored … would not lead to a shutdown." (Exhibit 2, Transcript of Joe Franell Depo., 33:21 – 34:1.)

On August 2, 2006, Holbo turned off Plaintiff's Network without any prior notice to plaintiff because of a brouhaha that had blown up over complaints by a newspaper columnist named Kathleen Parker ("Parker"), who had called and emailed Holbo the day before, complaining that her children had "Googled her" and seen a "doctored mugshot," which she asserted was "both obscene and a copyright infringement."  (Exhibit 8; Holbo Depo., 4:18-5:5; 11:9-13:10; 17:1-22.)  Parker's email contained a forward from someone who had instructed Parker to "have them shut down this IP address: **.***.**.**.  This IP number is owned by an entity in Ashland, Oregon -- http://www.ashlandfiber.net."[6] (Exhibit 8.)

Notwithstanding having foreknowledge that "one modem may service a large number of websites," no one employed by the City determined how much "collateral damage" would occur to other websites besides www.american-buddha.com when AFN/Holbo turned off Plaintiff's Network.  (Joe Franell Depo., 34:2-18.)  When AFN/Holbo turned off Plaintiff's Network, approximately forty websites were silenced, and all email accounts on Plaintiff's Network became unusable, and the Internet connections for plaintiff and plaintiff's counsel were shut down.  (Charles Carreon Dec. ¶ 13.)  Any person with Holbo's degree of Internet knowledge would know that such a shutdown would be merely retaliatory, because he had no power to remove the images from the location on the Internet where Parker and Holbo had viewed them -- the Google website.[7]

---

[6] Digits omitted to preserve security – the address does correspond to that of Plaintiff's Network.

[7] Google's search engine actually "hacks" the security on Plaintiff's Network, burrowing in and revealing to the Internet viewing public what plaintiff actually intends to reveal only to ABOL members, then "caching" that material on the Internet, where it often remains for an extended period of time.

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
CITY OF ASHLAND'S MOTION FOR SUMMARY JUDGMENT

The August 2nd shut-down was no accident.  As on every prior occasion since AFN ushered in the era of municipally-sponsored speech in the Summer of 1999, Holbo set the City's course without any written policy, much less a DMCA policy, to constrain his discretion.  The City Attorney, Mike Franell, made aware of Holbo's decision to turn off Plaintiff's Network, made no objection to the plan and allowed it to proceed.  (Joe Franell Depo., 13:5-14:8; Mike Franell Depo., 5:7-23.)

Although Joe Franell testified that Holbo had told him that InfoStructure requested the City to shut off Plaintiff's Network, Holbo's testimony and averments disclose another reality.  Holbo knows both more, and less, about copyright law, than he willingly discloses.  (Holbo Depo., 18:12-19.)  At first he claimed it was "not my job to determine whether something is copyright infringement or not," but then admitted that actually, it was.  (Holbo Depo., 20:1-20.)  Despite his feigned ignorance, Holbo knew that Parker's Exhibit 8 email was far from DMCA-compliant, because it wasn't signed under penalty of perjury, wasn't sent under the authority of a copyright-holder, and didn't identify the allegedly infringing material.  (Holbo Depo., 31:3-32:4.)  Holbo thus crafted a pseudo-DMCA notice for Parker's benefit, "cutting and pasting" copyright notice language from the Washington Post website so as to assert that The Washington Post Company was complaining of an infringement to *its* copyrights, sent it to Mike Franell for approval, and after receiving that approval, sent it on to InfoStructure.  (Holbo Depo., 37:20-40:21; Mike Franell Depo., 5:7-23.)  Holbo then phoned John Dowd ("Dowd") at InfoStructure and, misrepresenting a giant newspaper company as the source of the complaint, attempted to pressure Dowd into turning off Plaintiff's Network, a technical feat that Dowd/InfoStructure could have accomplished without Holbo's assistance. (Holbo Depo., 58:3-15.)  Notwithstanding Holbo's insistence, Dowd would not turn off Plaintiff's Network, and unable to engage a confederate at InfoStructure to engage in the desired retaliatory conduct, Holbo took matters into his own hands and turned off Plaintiff's Network himself.  (Holbo Depo., 58:3-15.)

Holbo was not "on a lark and a frolic." (Mike Franell Depo., 5:7-23.) Joe Franell clearly had no criticisms of Holbo's methods, since he adopted the AFN Policy that Holbo transferred from his memory to paper on August 11, 2006, finding it adequate to the job until at least the date of his deposition, three months later. City Attorney Mike Franell ratified Holbo's conduct three months later at his deposition, confirming that "he did what he was supposed to do." (Mike Franell Depo., 5:7-23.) Thus, two top City decision-makers approved and ratified Holbo's silencing of Plaintiff's Network.

Fortunately, Congress has provided a better way of handling the matters that the City left to Holbo's discretion. Section 17 USC § 512 was enacted by Congress as the Online Copyright Infringement Liability Limitations Act.[8] Section 512 provides a safe harbor from liability for copyright infringement claims arising out of websites hosted by an Online Service Provider ("OSP") that complies with three requirements of law:

(1) Designates an Agent to Receive Notification of Claims of Infringement at the US Copyright Office website;[9]

(2) Reviews notifications of copyright infringement to determine whether they meet the standards set forth in § 512(c)(3)(A), and thus constitute a valid "DMCA notice;" and,

(3) Adheres to the "notice and takedown procedure" set forth in § 512(g)(2)-(3) when it is presented with a valid DMCA notice.

---

[8] Despite Congress's choice of the acronym "OCILLA," in online-business parlance this name is little-used, and it is instead referred to as the Digital Millennium Copyright Act (the "DMCA"). Thus, plaintiff adheres to that convention by referring to "DMCA notices" and "DMCA policies." Confusion can arise during research, because judicial opinions and articles also refer to the anti-circumvention provisions at 17 USC §1201, that impose criminal sanction on copy-protection crackers, as "the DMCA."

[9] Section 512(c)(2) provides, in relevant part: "The limitations on liability established by this subsection apply to a service provider only if the service provider has designated an agent to receive notifications of claimed infringement [and] making available … including on its website in a locations accessible to the public" the contact information for its Designated Agent. (Emphasis added.)

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
CITY OF ASHLAND'S MOTION FOR SUMMARY JUDGMENT

The DMCA has been in effect since January 27, 1999.[10]  The City has been in the business of regulating Internet speech since AFN began providing Internet service in the summer of 1999.  (Exhibit 1.)  Three years ago, the Ninth Circuit noted that the DMCA notice and takedown provisions seems to strike a fair balance between the First Amendment rights of website publishers and the needs of copyright holders.  *Batzel v. Smith,* 333 F3d 1018, note 19 (9th Cir., 2003).  Joe Franell acknowledged that "a DMCA policy … is a great help in running an Internet service provider like Ashland Fiber Net," and that "determining the bona fide nature of any individual allegations of copyright infringement" is a "crucial activity for AFN." Three months after the August 2nd shutoff, the City remained immured in ignorance of the requirements of the DMCA, and manifested no concern about the consequences to the City or AFN users.  When he was deposed in November, Joe Franell still didn't know how to determine whether a complaint of copyright infringement was a valid DMCA notice, or whether to be valid, a DMCA notice was supposed to be sworn under penalty of perjury.   (Joe Franell Depo., 10:6-14.)  After seven years operating as an OSP subject to the provisions of the DMCA, on August 2, 2006, the City still had no written DMCA policy.  (Joe Franell Depo., 5:19-22.)

Over the years, the City has been consistent in its *laissez faire* approach to regulating Internet speech.  Keeping true to its established policy of allowing Holbo unfettered control over the "on-off switch" for AFN Internet speech, the only copyright-related policy the City had adopted as of the date of Joe Franell's deposition last November was one Holbo wrote, dated August 11, 2006, entitled "AFN Copyright Infringement Process," attached as Exhibit 4, and referred to herein as "the August 11, 2006 Policy."  (Joe Franell Depo., 6:14-21; 7:8-23; and Exhibit 4.)   The August 11, 2006 Policy does not adhere to the DMCA safe harbor in any of its particulars – indeed it is

---

[10] Note to 17 USC § 101 regarding *Effective Date of 1998 Amendments*.

clear that the only thing it accomplishes is to enshrine a system designed to maximize Holbo's discretion and maintain AFN's completely arbitrary posture toward the First Amendment rights of its Internet users.  Holbo told Joe Franell that he followed this after-adopted policy when he shutoff of Plaintiff's Network.  (Joe Franell Depo., 7:24-8:16.)  At the time of the deposition, the City was still following the August 11, 2006 Policy with respect to copyright infringement claims received by AFN.  (Joe Franell Depo., 21:18-2:6; Exhibit 4.)  According to Holbo, the August 11, 2006 policy was recorded in his memory until that date, although it had been in use by AFN for years.  (Holbo Depo., 21:1-20, referring to the August 11, 2006 policy as "Exhibit 1".)  Despite having it in writing for three months, Joe Franell didn't know whether the August 11, 2006 Policy complied with the DMCA, apparently thinking that because "my relationship is as a wholesaler to ISPs, I don't know it that is a requirement or not of the DMCA."  (Joe Franell Depo., 22:18-25.)  However, he did intend to "inquire into DMCA compliance with counsel for the City of Ashland … to determine whether perhaps some amendment" to the August 11, 2006 Policy "would bring it into compliance with the DMCA," and conceded that "in a sense, this case is highlighting a legal concern" on which he intended to follow up.  (Joe Franell Depo., 23:1-20.)

<u>ARGUMENT</u>

1. <u>The Summary Judgment Standard</u>

On a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.,* 669 F.2d 1278, 1284 (9th Cir. 1982). Where there is any reasonable doubt about the existence of a genuine issue of fact, it should be resolved against the moving party. *Hector v. Wiens,* 533 F.2d 429, 432 (9th Cir. 1976). Where inferences may be drawn from the underlying facts, the court must draw the inferences most favorable to the party opposing the motion. *Valandingham v. Bojorquez,* 866 F.2d 1135, 1137 (9th Cir. 1989). It is inappropriate to

grant summary judgment when different inferences are possible. *Sankovich v. Insurance Co. of North America,* 638 F.2d 136, 140 (9th Cir. 1981).

    2. <u>The Internet, The First Amendment, and The City's AFN Network</u>

    "The Internet is a worldwide network of computers that enables various individuals and organizations to share information. The Internet allows computer users to access millions of web sites and web pages. A web page is a computer data file that can include names, words, messages, pictures, sounds, and links to other information." *Panavision International v. Toeppen,* 141 F3D 1316, 1317 (9th Cir., 1998).  The City has elected to operate an organ of speech by building a citywide telecommunications network offering television, Internet access and webhosting.  States and their subsidiary municipalities are subject to the restrictions on government interference with rights guaranteed by the First Amendment.  *Nordyke v. Santa Clara County,* 110 F3d 707 (9th Cir. 1997).   It is axiomatic that the City's operation of AFN is subject to the limits established by the First Amendment of the United States Constitution, that provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble and to petition the Government for a redress of grievances.

    3. <u>Plaintiff's First Amendment Rights</u>

    Plaintiff American Buddha, an Oregon nonprofit corporation, enjoys the protections of the First Amendment.  *Jacobus v. Alaska,* 338 F3d 1095, 1121 (9th Cir. 2003).  "The government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected interests -- especially, his interest in freedom of speech.'" *Cain v. Tigard-Tualatin School Dist.,* 262 FSupp 2d 1120, 1122 (D. Or. 2003), *quoting Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

    4. <u>Section 1983 Claims For Retaliation Against First Amendment Exercise</u>

    Whenever politically motivated speech meets with reprisals from a person acting under color of law, or a municipal entity acting according to a policy, custom or practice

that ignores and tramples a citizen's right to free speech, a private right of action under 42 USC § 1983 arises in favor of the aggrieved plaintiff.  In *Cain, supra,* Judge Haggerty analyzed the claims of a high school student whose public high school football coach had retaliated against him for complaints about his coaching style:

> Under the general framework of First Amendment retaliation claims, plaintiffs must show: (1) a loss of a benefit or privilege caused by the retaliatory conduct; (2) plaintiffs were engaged in constitutionally protected speech; and (3) the protected speech was a substantial motivating factor for the adverse action.
> *Cain,* 262 FSupp 2d at 1125, *citing Ulrich v. City and County of San Francisco,* 308 F.3d 968, 976 (9th Cir. 2002).

5.  Disputed Facts Mandate a Trial of Plaintiff's First Claim for Relief

Plaintiff has pled a viable claim for retaliation against protected speech in violation of 42 USC § 1983 against the City.  Virtually any denial of "a benefit or privilege" imposed as a penalty for speech will satisfy the first element of the claim.[11] The City's denial of plaintiff's right to publish websites on the Internet is clearly sufficient detriment to give rise to a claim for relief.  The *Cain* opinion explains the rule with quotes from an instructive Supreme Court case:

> The infringement "need not be particularly great in order to find that rights have been violated." *Elrod v. Burns,* 427 U.S. 347, 359 n. 13, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (noting that the First Amendment is violated "both where the government fines a person a penny for being a Republican and where it withholds the grant of a penny for the same reason."). In fact, the Supreme Court has held that a speaker is protected from "even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights." *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 75 n. 8, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) [further citations omitted].
> *Cain,* 262 FSupp 2d at 1126.

The second element of the claim is satisfied because Plaintiff's Network was silenced in retaliation for its publication of political speech. The U.S. Supreme Court has called political speech "the essence of First Amendment expression." *White v. Lee,* 227

---

[11] In *Cain,* the student-plaintiff alleged he suffered three impairments in retaliation for his protected speech: "(1) his freedom of movement by being locked in an equipment room; (2) his choice of schools by having to transfer to Tualatin High School, which offered inferior academic and athletic opportunities; and (3) the benefit of attending the integrated math class during his senior year of high school."  262 FSupp 2d at 1125.

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
CITY OF ASHLAND'S MOTION FOR SUMMARY JUDGMENT

F3d 1214, 1228 (9th Circ. 2000), *quoting McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 347 (1995) (reversing District Court's grant of summary judgment where HUD agents harassed plaintiffs who published and distributed flyers and newsletter advocating politically controversial views).

The third element of the claim is satisfied because Rick Holbo silenced Plaintiff's Network in response to a single stimulus – Kathleen Parker's complaint that a "doctored mugshot" of her was being displayed on a website hosted at www.american-buddha.com. (Exh. 8; Holbo Depo., 13:4-7.)[12]  Thus, plaintiff's publication of the unpopular speech must have been a substantial motivating factor for the adverse action.

The City is considered a pioneer in some circles for having invested in AFN; however, the old rules still apply.  Whatever activities a governmental entity performs, it must perform them with due regard for the protection of the constitutional rights of its citizens.  By operating AFN, a telecommunications network that is an organ of Internet speech, the City assumed the duty to adopt legal policies that would provide constitutionally sufficient protections for plaintiff's First Amendment rights.  "[W]hen the actions of government officials so directly affect citizens' First Amendment rights, the officials have a duty to take the least intrusive measures necessary to perform their assigned functions."  *White v. Lee,* 227 F3d at 1237.  (Emphasis added.)

The City is liable for Holbo's acts conducted pursuant to the City's policy that gave him the unfettered discretion to indulge in retaliatory acts against plaintiff by shutting off Plaintiff's Network.  A local governmental entity is liable under § 1983 when "action pursuant to official municipal policy of some nature causes a constitutional tort." *Oviatt v. Pearce,* 954 F2d 1470, 1473-1474 (9th Cir., 1992), *quoting Monell v. Department of Social Servs.,* 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978 and *City of Canton v. Harris,* 489 U.S. 378, 389, 103 L. Ed. 2d 412, 109 S. Ct. 1197

---

[12] The article at www.ashlandfreepress.com critical of the City's decision to hire Joe Franell may have also had its effect on how the Franell brothers chose to handle matters dealing with Plaintiff's Network.

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
CITY OF ASHLAND'S MOTION FOR SUMMARY JUDGMENT

(1989). A government entity "may be liable for deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." *Cain,* 262 FSupp 2d at 1131.

Over the course of seven years, the City established a custom of operating AFN in a manner that gave Holbo control over the "on-off" switches of Internet speech, thus displaying deliberate indifference toward the First Amendment rights of Ashland citizens and AFN-users. The City could have adopted a DMCA "notice and takedown procedure," a Congressionally-created safe harbor for the City that would have cautioned Holbo against retaliatory conduct against websites he found offensive; however, AFN head Joe Franell exercised no administrative oversight of this important AFN function, giving Holbo an unconstitutionally broad grant of discretion to silence all forty websites on Plaintiff's Network with the click of a computer mouse.

In *Oviatt,* the Ninth Circuit found Multnomah County liable for its "policy of inaction," because "such inaction amounts to a failure to protect constitutional rights." *Oviatt,* 954 F2d at 1474, quoting *City of Canton, supra,* 489 U.S. at 388. Multnomah County's only "policy" was its failure to implement a system to guarantee inmates a timely arraignment. Plaintiff, a schizophrenic, was arrested on a bench warrant on March 8, 1986, lodged at the Multnomah County Detention Center, and scheduled "on the booking register" for a March 10th arraignment date; however, due to a clerical error, he was not arraigned until June 27, 1986. He was released on July 1, 1986 after 114 days in jail, five days after his case receiving judicial attention. The County's policymaker, Sheriff Pearce, knew that "from time to time" individuals were not being arraigned, but implemented no internal procedures for tracking inmate court appearances, instead relying on chance communications from inmates, attorneys, family members, and court personnel to set off alarms. Jail staff "had never been instructed to ask inmates whether they had been arraigned," nor had they been advised on how to deal with missed arraignments. *Oviatt,* 954 F2d at 1473. The Ninth Circuit observed, and apparently did

not find it exculpatory, that the County's own defense counsel argued that "Pearce was convinced that it would be more trouble than it was worth given the nature of the problem because it involved small numbers of people."

*Oviatt,* 945 F2d at 1473.

In *Oviatt,* a stubborn refusal to acknowledge the seriousness of denying the accused their right to a prompt arraignment gave rise to the County's liability under § 1983. The same analysis supports a claim of liability in this action. As the rule was set forth in *Oviatt*:

> To impose liability on a local governmental entity for failing to act to preserve constitutional rights, a section 1983 plaintiff must establish: (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy "amounts to deliberate indifference" to the plaintiff's constitutional right; and (4) that the policy is the "moving force behind the constitutional violation."
> *Oviatt,* 945 F2d at 1474, *quoting City of Canton,* supra 489 U.S. at 389-91.

Applying the rule to the case at bar establishes that plaintiff is entitled to a trial on its claims. Plaintiff had a First Amendment right to exercise its free speech by publishing websites to the Internet through Plaintiff's Network; the City had a policy of allowing Holbo untrammeled authority to shut down Plaintiff's Network; the City's policy "amounted to deliberate indifference" to plaintiff's First Amendment rights; and, the City policy "was the moving force" behind the shutoff of Plaintiff's Network. Additionally, the City can be found liable if the finder of fact concludes it had "an official policy, practice and custom … to inadequately supervise and discipline" its employee, Holbo. *See, Cain,* 262 FSupp 2d at 1131-1132 (failure to discipline coach who retaliated against student for his exercise of free speech supported claim for entity liability). Taking all inferences in favor of the non-moving party, as the Court must on this motion, the Court should deny the City's motion for summary judgment on the § 1983 claim.

6.    There Is A Vital Need For Declaratory Relief to Clarify Operation of the DMCA

Under the DMCA, an entity that operates a network of websites is an OSP. An OSP may designate an agent to receive DMCA notices by paying an $80 fee and

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
CITY OF ASHLAND'S MOTION FOR SUMMARY JUDGMENT

submitting the required form to the Copyright Office.  Plaintiff is an OSP, and has named Pine Creek Hosting, LLC as its Agent for Notification of Claims of Infringement. (Charles Carreon Declaration, ¶ 12.)  The size difference between AFN and plaintiff is of no importance when it comes to 17 USC § 512, because the rules apply to OSPs of any size, creating "upstream" and "downstream" OSP relationships.  Plaintiff is thus a "downstream OSP" of AFN.  However, when deciding what OSP should perform the notice and takedown duties under Section 512, the difference is an important once. Because AFN connects Plaintiff's Network to the Internet using one MAC Address, it has only a blunt tool to respond to a necessarily subtle situation – the removal of material alleged to infringe copyright, and only material alleged to infringe copyright – from Plaintiff's Network.

Because the City regulates speech when it disables MAC addresses on the AFN network, the rule of strict scrutiny applies.  As the Ninth Circuit stated in *White v. Lee,* 227 F3d at 1237:  "[W]hen the actions of government officials so directly affect citizens' First Amendment rights, the officials have a duty to take the least intrusive measures necessary to perform their assigned functions. *See Lamont v. Postmaster Gen. of United States,* 381 U.S. 301, 310 (1965).  (Emphasis added.)  A much less intrusive measure than what the City has used thusfar is to adhere to the DMCA notice and takedown procedure by allowing PCH, plaintiff's agent for receipt of DMCA notices, to receive DMCA notices and implement the notice and takedown procedure.  PCH stands ready, willing and able to perform all DMCA functions, and will do so with less intrusive effects on Plaintiff's Network, while preserving the legitimate rights of persons submitting DMCA notices.  (Charles Carreon Dec. ¶¶ 11-12.)  A declaration of the rights and duties of the parties in this developing area of law will be of assistance to the parties herein, and will prevent future repetitive litigation.

7.  <u>The Case Is Not Moot</u>

"Dismissal of a case on grounds of mootness would be justified only if it were absolutely clear that the litigant no longer had any need of the judicial protection that it sought." *Jacobus v. Alaska,* 338 F3d 1095, 1121 (9th Circ. 1996).  The risk that the City will shut off Plaintiff's Network again in the midst of a poorly-managed DMCA episode is not speculative; indeed, on Friday, January 19, 2006, as previously reported by plaintiff's counsel in an affidavit filed with this Court, a DMCA notice was the apparent cause of a loss of connection between Plaintiff's Network and the Internet.[13]  While the City has disclaimed responsibility for the January 19th outage, the risk of future outages continues, so the case is not moot.

Dated:  January 28, 2007

/s/Charles Carreon/s/
CHARLES CARREON (OSB #93469)
Attorney for Plaintiff American Buddha
Online Media Law, PLLC
423 Gateway Drive, #64
Pacifica, California 94044
Tel: 541-735-5277

---

[13] The affidavit was attached to plaintiff's Ex Parte Request for Extension of Time to Respond to Motion for Summary Judgment, filed January 29, 2007.

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
CITY OF ASHLAND'S MOTION FOR SUMMARY JUDGMENT